| | |
|---|---|
| 52 | 521 |
| 53 | 551 |
| 52 | 521 |
| 54 | 123 |
| 54 | 159 |
| 52 | 521 |
| 55 | 80 |
| 52 | 521 |
| 56 | 202 |
| 52 | 521 |
| 57 | 84 |
| 57 | 299 |
| 52 | 521 |
| 60 | 40 |
| 60 | 45 |
| 60 | 113 |
| 60 | 527 |
| 60 | 538 |
| 60 | 541 |
| 52 | 521 |
| 61 | 23 |
| 61 | 480 |
| 52 | 521 |
| 62 | 164 |
| 52 | 521 |
| 65 | 278 |
| 52 | 521 |
| 66 | 207 |
| 66 | 595 |
| 52 | 521 |
| 67 | 589 |
| e67 | 600 |
| 52 | 521 |
| 70 | 512 |

JAMES H. MORTLAND, PLAINTIFF IN ERROR, v. STATE, EX REL. M. OSBORNE CHRISTIAN, DEFENDANT IN ERROR.

1. The title of an act is, in the constitutional sense, aptly expressive of its object if it contain a mention of the subject matter generally, together with a succinct indication of the legislation respecting it.

2. Population may be made the basis of classification in a statute relating to counties of this state and their internal affairs, in cases where the legislative object is one naturally incident to population.

3. An act is not void because it refers to assembly districts as the precincts for the election of certain officers mentioned in the act. Such districts do exist in fact, and may be used for the purpose of defining a territorial limit.

4. *Quære.* Whether assembly districts may have any legal existence as political subdivisions of counties?

On error to Supreme Court. On *quo warranto*.

On April 3d, 1889, the legislature passed an act entitled "An act to reorganize the board of chosen freeholders in counties of the first class in this state." *Pamph. L.*, p. 163.

521

The general scheme of the act is to substitute a board of chosen freeholders elected by assembly districts for a board. elected by townships and wards in counties of the first class. The act now affects only Essex and Hudson counties. Other counties will come within its provisions as soon as they contain a population of one hundred and fifty thousand.

The facts, so far as they are pertinent, are as follows: The defendant below was elected a chosen freeholder by the voters of Clinton township, in Essex county, at the annual township election, held March 12th, 1889, under the former law. He actually took his seat in the board at the annual meeting in May, at which time the relator's seat would have expired but for the passage of the act in question. By that act it was provided that the term of office of all chosen freeholders elected before its passage (April 3d, 1889), which would otherwise expire before November 30th, 1889, should be extended to that date. If this act, therefore, be constitutional, the relator was entitled to continue in office until the time designated, and the defendant below had no right to a seat.

Two objections were suggested to the constitutionality of the act. It was argued, first, that the object of the act is not truly expressed in its title; second, that the act is a local and special law, regulating the internal affairs of towns and counties.

For the plaintiff in error, *John W. Taylor* (with whom was *Adrian Riker*).

The defendant, at the annual township election held March, 12th, 1889, was duly elected a chosen freeholder by the legal voters of the township of Clinton, in the county of Essex, for the term of two years, as successor to the relator, who, at the time of the election, was holding that office.

The defendant having qualified, was admitted to a seat in the county board at its regular annual meeting in May, 1889, and has since been enjoying the franchises and emoluments of that office.

The relator's term of office was one year, and would have ·expired in May last, but he claims title under an act entitled "An act to reorganize the board of chosen freeholders in the .counties of the first class in this state," approved April 3d, 1889, the seventh section of which provides for continuing in ·office the then existing members of the board, after the expiration of their official terms, and until November 30th, 1889.

The defendant insists that the act in question is unconstitutional and void.

I. Those provisions of the act in question, on which the· relator relies to support his title, are void, because not ·" ex-. pressed in the title."

1. The act is entitled "An act to reorganize the board ·of .chosen freeholders in the counties of the first class in this state."

2. Officers called chosen freeholders existed long before the incorporation and organization of the boards of chosen freeholders, and performed important functions as such officers, independently of any organization; for example, under the .act respecting bridges and several other acts.

3. The office of chosen freeholder has existed at least since February 28th, 1714 (see *Nev. L., p.* 32).; but they were not incorporated until February 13th, 1798—eighty-four years afterwards. See *Pat. L., p.* 265.

4. Their election, tenure of office and qualifications are not provided for in the act for their incorporation into, and organization as, "boards."

5. The first section of the act for their incorporation recog-·· nizes them as previously existing officers "of the · several townships, precincts and wards in the respective ·counties of this state," and provides that those officers shall be "constituted a body politic and corporate." See *Pat. L., p.* 265 ; *Rev., p.* 127.

6. Their election, qualifications and tenure of office are provided for by the act for the incorporation of the inhabitants townships, as in the case of other township officers. . See *Pat. L., p.* 284, § 12 ; *Rev., p.* 1195, § 12.

7. Provisions for the election, &c., of chosen freeholders would not be held valid under the title of "An act to incorporate the chosen freeholders in the respective counties of this state;" much less ought they to be held valid under an act entitled "An act to reorganize the board of chosen freeholders in counties of the first class in this state;" while the first relates to the incorporation of chosen freeholders into a "board," the second relates to the reorganization of the board after its incorporation.

It is therefore respectfully submitted that, as the title of the act in question assumes not only the existence of officers and their organization into a board, it was incompetent for the legislature, under that title, not only to belie it, but to provide (by legislation appropriate only to the townships, towns and cities of a county) for the creation of the very officers whose organization it professes merely to modify.

This point seems too plain to require extended argument, or to call for a citation of authorities. But I will refer to a few of the cases in point, viz.: *Rader* v. *Township of Union*, 10 *Vroom* 509; *Evernham* v. *Hulit*, 16 *Id.* 63; *Hendrickson* v. *Fries, Id.* 563; *Shivers* v. *Newton, Id.* 469; *Dobbins* v. *Northampton*, 21 *Id.* 496.

II. The act in question is a local or special law, "regulating the internal affairs of * * * counties," and violative of article IV., section 7, paragraph 11, of the constitution as amended.

1. That the act purports to regulate the internal affairs of counties is unquestionable.

2. That it applies only to counties of the first class appears by the title.

3. That Essex and Hudson are the only counties in that class is alleged in the information.

4. The act is local or special.

In *Warner* v. *Hoagland*, 22 *Vroom* 62, this court held that population may be made the basis of classification in statutes relating to municipal bodies and their police powers, but such classification cannot be made the means of evading the consti-

tutional interdict of local or special laws, where the classification is plainly illusory.

The act under consideration in that case provided that the opening, construction, care, cleaning, repairing, alteration and improvement of roads, streets, avenues, lanes, alleys and parks, and of the public sewers and drains in each of the cities of the state (except those of the first class), should be vested exclusively in the common council or board of aldermen.

The court say: "Provisions such as this act contains may be suited to the wants and necessities of cities of the limited magnitude to which the act applies. Applied to cities of the magnitude of the excluded class, as Newark and Jersey City, the act would disarrange the whole system of public improvements, and be productive of much harm."

*Randolph* v. *Wood,* 20 *Vroom* 85 (affirmed by the Court of Errors for the reasons given by this court), involved the validity of legislation in respect to "cities of the third class."

The court considered that "offices in small cities were avoided, not sought for, by proper men; that unless the duty, which election to public office enforces, is imposed for a considerable time, competent and experienced service is not likely to be obtained, and that in this larger cities differ," and therefore held that the legislation was not inappropriate.

But it is manifest that none of the considerations governing the decision of these cases can have any application to the case now before the court.

It may be conceded that cities of large population require a complicated government, with departments, bureaus or boards, while small ones may dispense with these expensive instrumentalities, and be able to manage their streets, parks, sewers, &c., through the simple agency of their common councils or aldermanic bodies; nor will it be denied that there is a necessity for encouraging office holding in small cities, by extending the terms of service, which may not exist in respect to large cities.

But who is able to discern a reason, based on population, for making the boards of chosen freeholders in Essex and Hudson counties consist of one member for each assembly district, that does not apply with equal force to the counties of Passaic, Union, Camden, Mercer and Middlesex? What peculiarity, arising from a larger population, calls for legislation depriving the municipalities of the counties of Essex and Hudson of their ancient right of representation in the county boards?

If a greater population necessitates or makes desirable a change in the number of members in the board, why should not that change be one enlarging, instead of diminishing, the membership? The boards of freeholders have never been inconveniently large bodies, even in the largest counties. Difference of population in counties does not, as in cities, justify or require difference in legislation for them.

The duties and powers of county governments, whether large or small, are very simple, relate to the same matters, and are as follows: "It shall be the duty of every such corporation, at their stated and annual meeting, or at any other meeting duly held for the purpose, to vote, grant and raise such sums of money for the building and purchasing of poor houses, jails, court houses and bridges, the surveying and ascertaining the lines, the prosecuting and defending the rights, defraying the public and other necessary charges, and doing, fulfilling and executing all the legal purposes, objects, business and affairs of such county." *Rev., p.* 128, § 4.

In contrast with this schedule of powers and duties, applicable alike to large and small counties, notice the elaborate and systematic enumeration of powers of the common councils of even the smallest cities, in relation to such a variety of important subjects as finance, morality, order, streets, markets, health, nuisances, police, &c.

III. The act in question is a local or special law, "regulating the internal affairs of towns."

1. The word "towns" is *nomen generalissimum,* and includes municipalities of every grade from townships to cities. *Pell* v. *Newark,* 11 *Vroom* 550, 555.

: 2. The law regulates the internal affairs of every city, town and township in Essex county.

. 3. By section 12 of the Township act (*Rev.*, *p.* 1195) it is ·enacted "that the persons qualified to vote at town meetings shall have full power and authority, at their respective annual meetings, to elect for such township, by a majority of votes, ·one clerk, one or more assessors, * * * two freeholders, ·commonly called chosen freeholders, * * * which said several officers shall hold their respective offices for one year, .and until others shall be chosen and legally qualified in their stead." See, also, *Pat. L.*, *p.* 284, § 12.

By their respective charters the different wards of cities are ·empowered to elect like· officers.

. 4. .As appears by the language of the section quoted, the freeholders, as well as. the other officers so chosen, are elected "for such township," and they act for and represent "such ·township," not only in the county board, but as individual officers, under the Lunatic Asylum acts, Road act and Bridge .act, &c.

Under the "Act respecting bridges" (*Rev.*, *p.* 84), where the expense of building or repairing a bridge in a township is ·over $50 and under $500, "the chosen freeholders of such township, and of the two next adjacent townships," may order the building or repairing of such bridge; and where the ·expense of building or repairing a bridge in a township is less than $50, the overseer of the highway "and the two chosen freeholders of the township" may order the building ·or repairing of such bridge.

· So, under ·the Lunatic Asylum acts, the chosen freeholder · or freeholders "of the township where such lunatic is found" are alone authorized to "approve" a certificate for his admission into the asylum. *Rev.*, *p.* 624, § 104. See, also, *tit.* "*Navigation*," *Rev.*, *pp.* 730, 731, §§ 23, 28.

5. The effect of the act in question, if sustained, is (among · other things) to deprive the inhabitants of townships and wards of their ancient and valued right of electing chosen .freeholders, and of being represented by them in what may be

called the county legislature; and also to deprive them of a. local, home tribunal for the prompt and speedy construction. and reparation of bridges.

If this does not amount to an interference with the internal affairs of towns, it is difficult to mention any act of legislation that would have that effect.

6. Again, the act undertakes, *ex proprio vigore*, to regulate· or interfere with "internal affairs" of the "towns" of Essex county in other respects:

· (1) By nullifying the last elections for chosen freeholders· and directing new elections to be held in November next.

· (2) By depriving the officers, then elected for the term of two years, of the right to hold their offices even for a day.

· (3) By continuing in office till December next chosen free-· holders whose terms expired in May last.

(4) By ousting from their offices on the 1st day of Decem-· ber next chosen freeholders whose official term would not expire until May next.    *Sections* 7, 8.

These officers, as has been shown, are township as well as· coun y officers, and the act under consideration, which sets· aside township elections, disfranchises township officers, appoints others in their places, and abrogates the right of township representation in the governing board of the county, is· as obnoxious as the one reviewed in the case of *Pell* v. *Newark*, 11 *Vroom* 550, in respect to which the learned Chief Justice,. in delivering the opinion of the Court of Errors, uses the following language:

"This law, by its own force, turns out of office, before the· conclusion of their terms, the city officers who have been duly· chosen by the people, and repeals the act under which they had been elected. It then changes the time of election.. \* \* \* I cannot think that any one will affirm that municipal elections are not the affairs of the city."

The act in question is liable to the same criticism, and· should receive the same condemnation.

7. The act in question, so far as relates to townships, is· aided by no classification, illusory or otherwise, and is appli-·

cable to the towns of only two counties out of twenty-one, and
to towns that do not substantially differ from the towns of
other counties. See *Pell* v. *Newark,* 11 *Vroom* 550; *Bing-*
*ham* v. *Camden, Id.* 156; *Coutieri* v. *New Brunswick, 15*
*Id.* 58; *Zeigler* v. *Gaddis, Id.* 363; *Hammer* v. *Richards,*
*Id.* 667.

For the defendant in error, *Frederic W. Stevens* (with
whom was *E. L. Price*).

On April 3d, 1889, the legislature passed an act entitled
"An act to reorganize the board of chosen freeholders in
counties of the first class in this state." *Pamph. L., p.* 163.

The general scheme of the act is to substitute a board of
chosen freeholders elected by assembly districts for a board
elected by townships and wards in counties of the first class.
The act now affects only Essex and Hudson counties. Other
counties will come within its provisions as soon as they con-
tain a population of one hundred and fifty thousand.

The facts, so far as they are pertinent, are as follows: The
defendant below was elected a chosen freeholder by the voters
of Clinton township, in Essex county, at the annual township
election, held March 12th, 1889, under the former law. He
actually took his seat in the board at the annual meeting in
May, at which time the relator's seat would have expired but
for the passage of the act in question. By that act it was
provided that the term of office of all chosen freeholders elected
before its passage (April 3d, 1889), which would otherwise
expire before November 30th, 1889, should be extended to that
date. If this act, therefore, be constitutional, the relator was
entitled to continue in office until the time designated, and the
defendant below had no right to a seat.

For the purpose of having the constitutional questions in-
volved in the case speedily settled, and so that there might
not be a conflict between two boards, each claiming to be the
legal one, it was agreed to waive all possible questions but the
constitutional one. I therefore limit the discussions to that.

Two objections were suggested to the constitutionality of the act. It was argued, first, that the object of the act is not truly expressed in its title; second, that the act is a local and special law, regulating the internal affairs of towns and counties.

I. As to the first of these objections, the rule is well settled that this constitutional provision "does not require the methods by which the object of the statute is to be effected to be stated in the title." *Rader* v. *Union*, 10 *Vroom* 518; and it is said, in *Hammer* v. *Richards*, 13 *Id.* 436, that "it is only in perfectly plain cases that it is proper for the courts to vacate statutes" on this ground. With these rules in view, it appears to be almost absurd to contend that the object of this act is not sufficiently expressed by its title. What short form of expression could better indicate the legislative purpose? To organize is "to form with suitable organs." "To arrange or constitute in parts, each having a special function, act, office or relation—applied to human institutions as a science, a government." *Webster.* To reorganize is "to reduce again to a regular body or to a system." To organize a board in the first instance, the legislature necessarily provides for the selection and qualifications of its members as well as for the mode and sphere of its action. To reorganize it, the legislature may provide for a different mode of selecting its members or for any other changes in it. The greater the changes the more radical the reorganization. Whatever is done, however, is nothing but reorganization, unless it amounts to abolition. This word "organize" is sometimes used in a secondary and narrower sense. Thus, the house of assembly is said to organize when it selects its officers and adopts rules of procedure. But this signification is no more common than the other. The term "reorganize" is almost always used in its broader sense.

In 1875 the legislature passed an act entitled "An act to reorganize the board of chosen freeholders in the county of Hudson." *Pamph. L., p.* 324. This act has been in operation for fourteen years without any suspicion of its unconsti-

tutionality. Will the court now declare that that board has been acting for all that time without warrant of law?

II. It is said, in the second place, that the law is a local and special law, regulating the internal affairs of towns and counties. If the law be neither local nor special, it matters not whether the thing regulated be a town or county. In either case it is a valid law.

It is certainly not local, because it is not confined to any particular locality. It may and, in course of time, will, with the growth of population in counties, extend to every part of the state.

Whether it be special or not depends upon the question whether it is competent for the legislature to provide for the more populous counties a system of administration differing from that which it provides for the less populous counties. Must Essex and Hudson counties, with their rapidly increasing populations, now and for all time to come, be restricted to the same system of administration as prevails in Cape May county?

I have always supposed that population could never be so properly adopted as a basis of classification as in the case of the mere machinery of administration. The inhabitant of Cape May is entitled to the same primary rights as the inhabitant of Essex, and he is bound by the same duties, but it does not follow that he is therefore entitled to the governmental machinery for securing and enforcing them. The distinction is between the fundamental right and the machinery by which the right is secured. The former has no necessary or even proper connection with population, the other is a necessary incident to it. Larger and denser populations require a more complicated machinery for their government in order that the same right may be, not theoretically, but practically, enjoyed by every citizen of the state alike. More officials are necessary. They must devote themselves more exclusively to their official duties. Departments must be created and their work systematized. Able and skilled officers must be employed, checks against peculation devised, and the supervising board

must be rendered more capable of rapid and efficient action. That form of county government eminently adopted to a small agricultural community may break down utterly when it is sought to apply it to a cluster of cities and towns. The principle, that population affords a proper basis of classification, so far as the mere machinery of government is concerned, has been established in the case of municipalities by the cases of *Randolph* v. *Wood,* 20 *Vroom* 85; 21 *Id.* 175, and *Warner* v. *Hoagland,* 22 *Id.* 62. And the principle applies equally to counties, whose internal affairs are not dissimilar.

If the municipality has to do with streets, police and the care of its poor, such a county as Essex at least is in like manner concerned with roads, bridges, courts and court houses, asylums and penitentiaries. These have become objects of great importance, requiring the outlay of large sums of money. If it be conceded that a different system of administration may be proper in the case of the larger counties, then it is for the legislature, and the legislature alone, to say what that system shall be. The classification adopted must not be illusory. There must be a reasonable connection between population and the legislative purpose. The one must grow naturally out of the other (*Paul* v. *Gloucester Co.,* 21 *Vroom* 585); but if it does, the court has no ground for interference.

Is there, then, any proper relation between population as a basis of classification and the proposed scheme to reorganize the board?

Its main features are—*first,* a longer tenure of office than prevailed prior to 1887, viz., two years instead of one; *second,* larger compensation to the members, viz., $1,200 to all the members except the director, who is to receive $2,000, instead of a *per diem* of $2; *third,* a very considerable reduction in the number of members, viz., in Essex county, eleven members instead of forty; *fourth,* a more equitable representation in the board of different political divisions of the county.

The first of these is now possessed by all the counties; of the second, little need be said. It will be conceded that where the affairs of the counties are, by reason of its populousness,

more intricate and the duties more exacting, increased com-
pensation is not unreasonable. In this respect, at least, the
natural relation between increased population and the legis-
lative plan is obvious. The other two features demand a
more extended notice.

If the teachings of experience in matters of government are
of any value, they indicate this: that while the legislative
body may be large, the executive body, particularly where its
duties are important and complicated, should be composed of
but few members. The duties imposed upon freeholders are
almost exclusively administrative. The care of roads and
bridges, of court houses, of asylums and penitentiaries, the
management of the finances of the county, are among the
most important. As the populations of counties increase, the
wards of cities are multiplied and townships subdivided.
The representatives of these divisions in the board of free-
holders at last become so numerous that the body itself becomes
unwieldy. In this condition of things is it not competent for
the legislature to say that the members shall be elected from
larger constituencies, and that these constituencies shall send
one instead of two representatives? At what particular point
of time in the existence of these bodies they shall be deemed
to have become less capable of efficient action, is for the legis-
lature, and not the courts to say. So, too, is it for the legis-
lature and not the courts to say how the larger constituencies
shall be made up. In this third feature of the law, therefore,
is not the connection between the legislative plan and increased
population apparent?

The fourth and other feature which it is necessary to allude
to is, that the law, on the whole, secures a more equitable
representation in the board of the different political sub-
divisions of the county. This will be at once apparent from
the facts.

One freeholder was elected biennially from each of the
wards of Newark and Orange; one freeholder was elected
annually from each of the townships and held office for two
years, so that the township was always represented in the

board by two members.  As there are fifteen wards in Newark and three in Orange, this gave to these two cities a total representation of eighteen members, representing a constituency (by the census of·1885) of one hundred and sixty-eight thousand two hundred and nineteen people, and a taxable valuation of $102,548,000.  The tax valuations here referred to are those of 1888.  There are eleven townships which had a representation in the board of twenty-two members, but their aggregate population was only by the same census forty-five thousand five hundred and forty-five, and their taxable valuation $24,431,000.  So that with a population nearly four times as great, and with a taxable valuation over four times as great, Newark and Orange together were actually outvoted in the board.

This certainly smacks very strongly of what used to be called the "rotten borough system."  Years ago the law worked fairly, but an enormous increase in the wealth and population of Newark produced a condition of things quite at variance with the fundamental rule, that taxation and representation should go hand in hand.

The inequalities of the former system might be further exemplified.  The sixth ward of Newark in 1885 contained a population of twenty thousand and twenty-eight, with a tax valuation of $6,318,000; the thirteenth ward, twenty-two thousand six hundred and fifty-two, with a tax valuation of $6,048,000.  Each ward was represented in the board by *one* freeholder.  The township of Franklin had at the same time a population of one thousand six hundred and two, with a tax valuation of $555,000, and the township of Livingston, one thousand two hundred and seventy-five, with a tax valuation of $595,000.  Each was represented in the board by *two* freeholders.

In this case, too, it is apparent that an ever increasing population brought about inequalities that could only be rectified by a law which classified with reference to it.  In selecting assembly districts (of which in Essex county there are ten) instead of wards and townships, and in thus availing itself

of a long existing political subdivision, with its appropriate
machinery for conducting elections, instead of resorting to
some new and untried one, can it be said that the legislature
so far erred that the court will, for that reason alone, arrest
its action? Will it not rather be admitted that if a change
be advisable, no more appropriate substitute could possibly
have been found?

One of the last restatements of the rule to be applied in
all cases of supposed conflict of the law with the constitution,
is to be found in *Dobbins* v. *Northampton*, 21 *Vroom* 499. It
is there said the only classification allowed is that which
embraces a group of objects distinguished by qualities and
characteristics sufficiently marked and important, having
regard to the purposes of the legislature, to make them a
class by themselves—including all, excluding none which
pertain to the class. Now, I think it has been demonstrated
that the law in question fully complies with the terms of this
rule. Having reference to the purpose of this law—which is
merely a change in the governmental machinery of the larger
counties—it is clearly apparent that the relation between that
purpose and population is not arbitrary, but natural and in-
herent. I think it is also apparent that this characteristic,
viz., population, is sufficiently marked and important, in view
of that purpose, to constitute the group a class by themselves,
for this kind of legislation. It would be strange indeed if
the legislature was without the *power* to give to the larger
counties a governmental machinery such as they needed, with-
out forcing upon the smaller counties a form of government not
adapted to their wants and opposed to their traditions (see *Van
Giesen* v. *Bloomfield*, 18 *Vroom* 446, 447; *Warner* v. *Hoag-
land*, 22 *Id.* at *p.* 69). All counties that now have, or may
hereafter have, a population of one hundred and fifty thousand,
are included within the operation of the law, and so it is also
brought within that part of the rule which says that none
shall be excluded.

It is objected by counsel in his brief, that the legislature
should have included in its grouping counties of the second

class, that is, counties having a population not less than fifty thousand and not more than one hundred and fifty thousand. But, in the first place, it is apparent that these counties are not within the mischief of the law, and in the second place, it has been decided, again and again, that it is for the legislature, and not for the court, to say, in cases in which population is recognized as a proper basis of grouping, what the limit of population shall be in the given case. *Rutgers* v. *New Brunswick*, 13 *Vroom* 51; *Jelliff* v. *Newark*, 19 *Id.* 101; *Hart* v. *Scott*, 21 *Id.* 585; *Warner* v. *Hoagland*, 22 *Id.* 62.

*Skinner* v. *Collector*, 13 *Vroom* 411, decides that the population of a county may well form the basis for determining the salary to be paid to the presiding judge. Would it not as well form the basis for determining how many judges of like jurisdiction might be allotted to a county whose population had grown to such an extent that a single judge could no longer despatch the public business? If population may be resorted to in the case of the judicial officers of a county for the purpose of determining their number and compensation, why may it not be, in like manner, resorted to for the purpose of determining the number and compensation of its executive officers?

It is said in one of the briefs, that the act is repugnant to the last clause of article IV., section 7, paragraph 4, of the constitution. This objection is completely disposed of by the cases of *Campbell* v. *Board of Pharmacy*, 16 *Vroom* 241; *Evernham* v. *Hulit, Id.* 54.

I have discussed all the objections to this law which seem to me to merit attention. The other objections urged in counsel's brief, go either to its expediency or to its supposed want of harmony with other laws. These are not constitutional questions, and the court will not consider them. It may be said, however, that the act to reorganize the board of chosen freeholders in Hudson county, before alluded to, is, in these particulars, not unlike the law under review, and no practical difficulties of the sort suggested by the ingenuity of counsel appear to have been encountered in its administration.

The opinion of the court was delivered by

GARRISON, J.   1. The title of an act is, in the constitutional sense, aptly expressive of its object if it contain a mention of the subject matter generally, together with a succinct indication of the legislation respecting it.   In the present case the matter to be dealt with is boards of chosen freeholders in counties of the first class, and the legislative object is the reorganization of such boards.   All of this is indicated by the title of the act; greater particularity is not required. *Rader* v. *Union*, 10 *Vroom* 509, 518.

That the counties to be affected are referred to as of the first class, does not touch the constitutionality of the act if its subject matter be one having a natural relation to population.

The cases of *Randolph* v. *Wood*, 20 *Vroom* 85; *S. C.*, 21 *Id.* 175; *Hart* v. *Sivil*, *Id.* 585, and notably *Warner* v. *Hoagland*, 22 *Id.* 62, have put this question at rest, and delimit the functions of the Classification act.

2. The act in question regulates the internal affairs of counties, and hence is unconstitutional if it be local or special. The act purports to operate upon a class of counties generally, viz., those having a population of one hundred and fifty thousand and upwards.   Hence, if the legislative object be one for the imposition of which population affords a proper basis, the act is general, without regard to the number of counties to be affected by its operation, or to the wisdom or unwisdom of applying its provisions to the counties so selected.   From this brief statement of the principle adopted by the courts of this state in dealing with the constitutionality of laws claiming to be general, it is evident that the controlling question in each case is whether the provisions of the act are such as are germane to population.   The act under review concerns the machinery for the administration of county affairs.   The class of counties selected are those having the largest population.   If the provisions of the act are such that they would be equally appropriate to the other counties of the state, then the classification adopted is illusory, not real, and the legislation is special, although sounding in gen-

eral terms. It is necessary, therefore, to look at the provisions of the act somewhat in detail, not for the purpose of passing upon their merits or demerits, but in order to ascertain whether their substantial features, while applicable to larger counties, are inapplicable to the smaller ones.

The main features of the proposed change affecting the boards of chosen freeholders erected under this act are (1) a longer term of office; (2) a considerable reduction in number; (3) the election of a director at large, to whom special powers are delegated; (4) a large increase in salary; (5) the requirement of a bond in the sum of $15,000 from each member and $25,000 from the director for the faithful performance of their duties; (6) the election of members of the board from assembly districts instead of from wards and townships.

No one familiar with the construction and operation of boards of freeholders in the several counties in this state can fail to see that by this scheme an entirely new and distinct system of administrative machinery is provided, one more compact in form, with greater executive possibilities, making greater demands upon the time and services of the members, for which increase of pay is provided, together with an increase of individual responsibility, with which is coupled a substantial security to the public by means of bonds with heavy penalties. That such a system is not applicable to the smaller counties, is not less evident than that the existence of such machinery would be an unnecessary and disastrous burden upon their finances. Whether the largest counties do require boards of such increased efficiency is not for us to decide. If they do, it is evidently in respect to matters growing out of excess of population. The legislature, in whom the determination of these questions is vested by the constitution, has decided that counties of the first class do require a change of the character indicated by this act, which changes, from the considerations just mentioned, are inappropriate to the smaller counties for the same reasons which constitute their appropriateness to the larger ones. Such being the rela-

tion borne by the provisions of this act to the various counties. of this state, viewed from the standpoint of population, the act in question must be deemed to be general in that it reaches the one class to which the legislature has determined that it is appropriate, and that that class is distinguished by those features which constitute its appropriateness from all the other counties in the state.

Referring to the suggestion made on the argument, that the assembly districts, which by this act are referred to as the precincts for the elections of freeholders, were not legal legislative creations, inasmuch as the constitution contains no intimation but that members of assembly shall be chosen by the counties at large, it is sufficient to say that we are not now concerned with the legality of such subdivisions of counties. The act under review refers to these districts for the purpose of defining a territorial limit. Such precincts as assembly districts do exist, whether legally or not, and to each of these *de facto* districts a freeholder is assigned. Beyond this we need not, at this time, go.

The act being constitutional, the relator is entitled to judgment, with costs.

*For affirmance*—THE CHANCELLOR, DIXON, GARRISON, SCUDDER, BROWN, CLEMENT, COLE, SMITH, WHITAKER.    9.

*For reversal*—MAGIE, REED.    2.