THE STATE, EX REL. EDWARD HOOS, v. MICHAEL J. O'DONNELL, CITY CLERK OF JERSEY CITY.

An act entitled "An act relating to cities of the first class in this state, and providing for the holding of municipal or charter elections therein, and regulating the terms of elective and appointive officers therein," approved March 18th, 1897, is a local and special law regulating the internal affairs of towns, and for that reason is unconstitutional.

On *mandamus.*

Argued at February Term, 1897, before Justices GARRISON and GUMMERE.

An application was made in this cause for a *mandamus* to be directed to the city clerk of the city of Jersey City, directing him to file the certificate of Edward Hoos as a candidate for the office of mayor of Jersey City, and also to compel the respondent, as such city clerk, to print the ballots for the municipal election in that city.

The first application was granted, and a peremptory *mandamus* was directed to be issued and the following opinion filed:

PER CURIAM.

With respect to the duty of the city clerk to receive and file the certificate of nomination we have no difficulty. Section 205 of the Election act provides that nominating bodies of a political party may nominate candidates for public office. Section 206 prescribes the form of the certificate, and section 209 requires the written acceptance of the candidate so nominated. Section 223 declares that certificates in apparent conformity with the provisions of this act shall be deemed to be valid. If objection is to be raised before the clerk, it must be presented to him in writing within five days and notice by him given to the candidate affected. If the candidate makes application to the justice of the Supreme Court holding the Circuit of a threatened invasion of his right under such certificate, a summary hearing may be had.

The plain interpretation of these provisions is that the action of the political body in question having been certified in the manner prescribed by the statute, the certificate should have been received and filed by the clerk, leaving both objectors and the candidate to pursue the respective remedies given to each by the statute. Any other interpretation would

be intolerable, for it would place it in the power of the clerk, of his own motion and without even the knowledge of the party affected, to ignore the certificate.

Where the supposed invalidity arises not from any lack of "apparent conformity to the provisions of the act," but from some matter *aliunde*, as in the present case, the clerk, if he have jurisdiction (for none is expressly given him), must derive it by the strictest conformity to the statute by which it is claimed to be conferred.

Our opinion, therefore, is that, inasmuch as no objection in writing was filed with the clerk in the present instance, his duty to treat the certificate as valid was clear.

Inasmuch as this determination rests upon a mere interpretation of the Election law, and does not involve the constitutionality of the statute of 1897 (*Pamph. L., p.* 43), we have thought it right to dispose of it as soon as practicable.

A peremptory *mandamus* should issue directing the respondent to file the relator's certificate.

The application for a *mandamus* to compel the city clerk to print the ballots for an election, cannot be disposed of without passing upon the constitutionality of the statute of 1897 above referred to. The decision of a question of this importance should, in our judgment, be made in a form capable of review by either party. The question will be presented in such form if the facts contained in the stipulation of counsel now before us be treated as the return to an alternative writ to which the relator has demurred. We will hear the parties at the state house on Thursday, April 1st, at eleven thirty A. M., on an application to frame pleadings in accordance with this suggestion, unless the parties shall before that time notify us of a stipulation by them to the effect that the issue may be regarded as so presented.

The application for a *mandamus* to compel the respondent to print the ballots for the election was heard as of the February Term, 1897, before Justices GARRISON and GUMMERE.

For the relator, *Allan L. McDermott* and *William D. Daly.*

For the respondent, *John Griffin.*

For Jersey City, *Spencer Weart, Chandler W. Riker* and *Charles L. Corbin.*

GARRISON, J.   The question to be decided is whether "An act relating to cities of the first class in this state, and providing for the holding of municipal or charter elections therein, and regulating the terms of elective and appointive officers therein," approved March 18th, 1897 (*Pamph. L., p.* 43), is a constitutional enactment, in view of section 7, article 2, of the constitution, which forbids the passage by the legislature of any local or special law regulating the internal affairs of towns and counties.   Inasmuch as the statute cited is admittedly a regulation of the internal affairs of the cities affected by it, the inquiry takes this shape : May cities having a population of one hundred thousand and upwards be selected from among the cities of this state for the special regulation imposed by this act?   A uniform line of decisions, expounding the constitutional provision referred to, narrows the question to its ultimate form, viz., Is the subject-matter of this act one that is naturally incident to mere excess of population ?

The act deals with a single subject, which is contained in the first six lines of its first section ; all that follows is merely ancillary.   The substantial provision referred to is in these words :

"1.  Hereafter in all cities of the first class in this state, all municipal officers required to be elected therein shall be voted for and elected on the first Tuesday after the first Monday of November in each year, and upon the same official ballots required by law for the election of state and county officers and not otherwise."

From this language we must learn the conditions that called forth the regulation ; in it discover the mischief of the

old law, and from it gather the principle of remedial legislation applied by the lawmaker. The matter is within a small compass. The condition that existed was that elections to fill municipal offices were held at a different time from those at which county, state and federal elections were held. The mischief, therefore, whatever it may have been, was something that inhered in the practice of voting separately for these purposes. The remedy consists in the requirement that municipal officers shall be voted for at the same time that the others are elected and upon the same ballot. In fine, the mischief was that local affairs were kept separate from state and national politics, and the remedy is to bring them together.

This remedy, it will be seen, operates solely upon the individual voter. Its efficacy depends wholly upon the success with which it brings to bear upon him the influences set at work by the commingling of what had previously been kept separate. Else it is no remedy, and such is its avowed purpose. Beyond this it makes no claim. It does not operate upon the municipality itself; it adds no feature to city government, creates no new office and enlarges no public power. To the voter alone it is addressed; finding him hampered as an elector by the condition referred to, it proposes, for the public good, to expose him henceforth to the influences that will arise from the new order that it institutes.

Furthermore, the act is not limited to its effect upon municipal affairs, and, as the mischief is not a mere incident of population but the result of a system in nowise conditioned upon numbers, so the remedy is broader than these, affecting the voter in all of his relations to the expression of the popular will.

This being beyond question both the purpose and effect of the law, it is in its essence a declaration of public policy, and I believe I shall not err in saying that a legislative policy, with respect to the influences to which the voters of a state shall be subjected or from which they shall be guarded in the

act of suffrage, cannot, under the organic law construed by our courts, be limited to a special class selected upon a purely numerical basis. The distinction between such a provision and those that are passed upon in *Mortland* v. *Christian,* 23 *Vroom* 521, and the other cases cited, is entirely clear. Administrative details may be varied to meet the exigencies of population, the number of officers, their duties and emoluments, the machinery for voting, the apparatus for canvassing votes may be changed to suit conditions that exist only in the places affected; but whatever is to influence the mind of the voter to determine his conduct as an elector and to find expression in his ballot, is necessarily a matter of public policy and not a question of local administration.

The beneficent results expected from the statute now before us are all based upon the claim that the popular will can be expressed better under the new law than under the old. The statement is of itself a definition of public policy and an apt illustration of such a rule.

"All regulations of the elective franchise," says Judge Cooley (*Const. Lim.* 758), "must be reasonable, *uniform* and *impartial,*" thereby placing the instrument of popular representation in the same category with the right of taxation, with which it has, in this country at least, always had an historical association. If this be not a correct view, then the changes introduced by the adoption of secret voting could have been inaugurated in certain places upon the mere ground of population; or the provision of the Election law that prohibits the solicitation of a voter within a hundred feet of a polling-place can to-day be altered so as to exempt cities of a certain class from its operation; or the voter in cities of the first class may be permitted to place a distinguishing mark upon his ballot, or in a city of the third class he may reveal its contents within the polling-room. The sole reason why these may not be done is because of the distinction to which I have referred, viz., that regulations of the conditions that shall surround a voter, with the object of influencing his con-

duct as an elector, are in their nature matters of public policy and must find expression in the general laws of the state.

If I am right in regard to this, the statute under review is fatally invalid, in that the legislature therein has provided that a voter in Newark or in Jersey City or other city of one hundred thousand population, shall cast his vote for municipal officers under the current influence of state or national politics, and shall vote upon these wider interests under conditions wherein purely local issues may dominate, whereas elsewhere throughout the state no such influences are permitted or experienced. The point is not that this policy is unwise and hence is unlawful, but that, however wise it may be, it must be accomplished in a lawful manner. It is not the duty of the courts to question the policy of this law; it is their duty to say that the policy declared by the law is a public one, and that it does not arise from conditions that are expressed in the terms of mere population, and that it can lawfully be limited only by the extent of the mischief that it undertakes to remedy.

Holding these views, I am of opinion that the statute referred to is void, and that in the proceeding before us a peremptory *mandamus* should issue commanding the city clerk to print the ballots as required by the General Election law of the state.

GUMMERE, J. This controversy presents but a single question which requires consideration, and that is whether the act of March 18th, 1897, entitled "An act relating to cities of the first class in this state, and providing for the holding of municipal or charter elections therein, and regulating the terms of elective and appointive officers therein," is constitutional or not.

The prime object sought to be accomplished by the act is the election of municipal officers in cities having a population exceeding one hundred thousand, on the same day and by the same ballot that county and state officers are elected.

This is provided by the first section of the act. It is not necessary, for the purposes of this case, to set out the further provisions of the statute, as they do not in any way aid in the solution of the question presented.

The validity of the act is challenged on the ground, among others, that it is in contravention of that provision of our constitution which forbids the passage of any local or special law regulating the internal affairs of towns or counties. That the act does regulate the internal affairs of certain of the cities of the state is apparent. The determination of the question before us, therefore, must depend upon whether it is a general law or whether it is local or special within the constitutional meaning of those terms.

The effect of this constitutional mandate upon legislation affecting only such cities as have a population within prescribed limits has frequently received consideration, both in this court and in the Court of Errors, and it is now settled beyond controversy that population may be made the basis of classification in statutes relating to municipal affairs in all cases in which it bears a reasonable relation to the subject-matter of the legislation. But, as was said by Mr. Justice Depue, in *Warner* v. *Hoagland*, 22 *Vroom* 68, "It must not be inferred, from these decisions, that classification may be resorted to as a means of evading the constitutional interdict against local and special laws, where the classification is illusory. A law is to be regarded as general only when its provisions apply to all objects of legislation, distinguished alike by qualities and attributes which necessitate the legislation, or to which the enactment has manifest relation. Such law must embrace all and exclude none whose conditions and wants render such legislation equally necessary or appropriate to them as a class." To the same effect are *Randolph* v. *Wood*, 20 *Vroom* 85; *S. C. on error*, 21 *Id.* 175; *Helfer* v. *Simon*, 24 *Id.* 550; *Dexheimer* v. *Orange*, 36 *Atl. Rep.* 707.

As I have already stated, the object of this statute is to unite municipal or charter elections in cities of the first class—

that is, in cities having a population in excess of one hundred thousand—with elections for county and state officers; and unless the union of such elections bears a reasonable relation to the number of inhabitants of the cities in which they are united—if the statute does not embrace every city, and exclude none, whose condition and wants render such legislation equally necessary or appropriate to them—it comes within the constitutional interdict.

Being keenly aware of the great confusion which must result from a judicial declaration that this act is special in its character, and therefore unconstitutional, I have striven to find some ground upon which it could be brought within the rule laid down by the cases to which I have referred, but I have been unable to perceive how this legislation, if it be a public necessity for cities having a population of over one hundred thousand, is not equally a necessity for those having a smaller number of inhabitants.

We are, indeed, told by counsel that this legislation is needed in cities of the first class, because, in those cities, voters are sometimes intimidated, votes are purchased and fraudulent votes cast, and that fraudulent returns are made of the votes in the ballot-box; but unfortunately, these evils, as is well known, exist also in cities having a population of less than one hundred thousand, although, perhaps, not to the same extent, and if the consolidation of municipal and state elections will tend to do away with these evils, surely the conditions and wants of these smaller cities render the legislation in question equally appropriate to them.

We are also told that, in the cities of the first class, the places of business of many of the voters are located at a long distance from the places where they cast their votes, and that, because of the fact that the day for holding municipal elections is not a legal holiday, they remain away from the polls, with the result that the total vote cast in those cities at such elections is much smaller than that cast at the fall elections; and it is urged that, for this reason, it is important that in

such cities the elections should be consolidated, in order that the charter elections should be held on a legal holiday and thus bring out a larger vote than can now be obtained. But it is equally true that in cities which are not of the first class, the vote cast at charter elections is usually much smaller than that cast at the state and county elections and for the reasons stated; and if the union of the two elections, and the holding of the joint election on a legal holiday, will benefit cities of the first class by bringing out a larger vote for municipal officers, it will, for the same reason, be equally beneficial to many of the other cities of this state.

Again, it is said that, in cities of the first class, the expense of holding their municipal elections has grown to be so great as to have become an intolerable burden, and we are told that for this reason these cities are properly classified for the purposes of this legislation. But it is unquestionable that the expense of holding an election is, to a large degree, proportionable to the population of the municipality in which it is held, and that the larger cities, by reason of their richer treasuries, are not less able to bear the burden cast upon them than their weaker and smaller sisters. And even if it be true that the election expenses of a city of the first class are proportionately larger than those of cities having fewer inhabitants, still it is only a matter of degree, and, if it is to the interest of these larger cities to be relieved from the expense of holding two elections in each year, clearly it is to the interest of the smaller cities also to be relieved from this burden.

The only other reason suggested by counsel for constituting cities having a population of over one hundred thousand into a class for the purposes of this legislation is based upon the statement that, in those cities, property is generally rented for terms which begin upon the 1st of May, while in the smaller cities leases generally run from April 1st. There is no evidence before us, however, of any such condition of affairs, and the statement is not justified by the fact. The beginning day of the term for which property is rented in our various

cities depends much more upon their geographical locality than upon the number of their inhabitants. In those cities lying in the neighborhood of New York, the commencement of the term is generally the 1st day of May, while in the more southerly and westerly part of the state, April 1st marks the beginning of the renting year.

Nothing else is suggested by counsel as differentiating cities having more than one hundred thousand inhabitants from those having a less number, with relation to the consolidation of municipal with state elections, except that in those cities the fiscal year commences in the month of December; and it is argued that, on this account, legislation which changes the date of the municipal elections in those cities from spring to a time shortly prior to the commencement of such fiscal year is not special in its character. But this argument assumes what is not true, viz., that it is only in cities having more than one hundred thousand inhabitants that the fiscal year begins at or about the time mentioned, and consequently does not require consideration here.

There being nothing in the grounds suggested by counsel which will justify the conclusion that the statute before us applies to *all* cities which are distinguished by qualities and attributes which necessitate this legislation, or to which it has manifest relation, and none being perceived, I am reluctantly compelled to declare this law unconstitutional.

I have not overlooked the cases referred to in the briefs of counsel with the respondent, such as *Mortland* v. *Christian,* 23 *Vroom* 521; *In re Haynes,* 25 *Id.* 7; *Matheson* v. *Caminade,* 26 *Id.* 4, and *McLaughlin* v. *Newark,* 28 *Id.* 298, and which, it is claimed, support the contention that the act under consideration is not illusory in its classification, and is a general, not a special, law. An examination of those cases, however, will show that the statutes there dealt with related to the structural forms of government and administration of the cities of this state on the basis of their population, and it is entirely settled that, for this purpose, the municipalities of the state may be distributed for legislative action into classes

constructed upon this basis, and that, in making such distri-bution, it is the function of the legislature to determine where the line of demarcation between the larger and smaller aggre-gations of people shall be placed.

The distinction between such cases and the present one is plain.

The relator is entitled to a peremptory *mandamus.*